James **MONROE** et al., Plaintiffs,

v.

**Frank PAPE** et al., Defendants.

No. 59 C 329.

United States District Court
N. D. Illinois, E. D.

Sept. 18, 1963.

Donald Page Moore, Overton, Marks, Simons & Moore, Chicago, Ill., for plaintiffs.

John C. Melaniphy, Corp. Counsel, Benjamin E. Novoselsky, Asst. Corp. Counsel, City of Chicago, Chicago, Ill., for defendants.

PARSONS, District Judge.

I have before me two motions: (1) The motion of the defendants for judgment notwithstanding the verdicts; and (2) The motion of the Illinois Public Aid Commission to intervene. The facts of this case, insofar as they are pertinent to these motions, may be stated briefly as follows:

Peter Saisi was murdered on the evening of October 27, 1958. When the police arrived at the scene, Mrs. Saisi explained that two Negro men had entered her home and killed her husband. She stated that the men had escaped with a sum of money and a number of white dress shirts.

The day after the murder, the police had Mrs. Saisi report to Central Police Headquarters at 1121 South State Street, Chicago, Illinois, and examine some photographs. After having looked at a substantial number, Mrs. Saisi finally announced with reference to one of the photographs, "It looks like him". The photograph was that of James Monroe, age thirty, of 1424 South Trumbull Avenue, Chicago, Illinois.

Between 4:00 P.M. and 12:00 Midnight on October 28, 1958, defendant Edward Cagney, the supervising sergeant of the detectives who were assigned to the homicide section of the Chicago Police Department, received the information that earlier that day Mrs. Saisi had "tentatively identified" James Monroe as being one of her husband's slayers. Thereupon, Cagney ordered that Monroe be "picked up" and placed in a "line-up" for Mrs. Saisi to observe.

At Midnight, the defendant Frank W. Pape reported for duty at Central Police Headquarters. He was the Deputy Chief of Detectives, the number two ranking officer in the Detective Bureau. During the early portion of his tour of duty, he was informed of Cagney's order and that Mrs. Saisi had made a "tentative" identification of Monroe.

Pape arranged to have eight subordinate policemen meet with him between five and six o'clock that morning at a designated point several blocks from the Monroe home. At the specified time and place, all of the men arrived. No one had secured or attempted to secure either an arrest or a search warrant. All of them were attired in citizen's dress. Pape briefed his men on their project and designated the positions they were to take. Then, in four unmarked squad cars, they proceeded to 1424 South Trumbull Avenue.

Pape, followed by two other officers, walked to the back door of the basement apartment and rapped. In a matter of minutes, one of the Monroe children appeared at the door and turned on the kitchen light. Through the window of the door, Pape displayed his badge and asked, "Is Monroe here?" The door was opened. Pape entered inquiring, "Where is James Monroe?" The child replied, "He is in the front bedroom".

Pape led the way down the long hallway and into the dark bedroom. Turning on his flashlight, he found James and Flossie Monroe in bed. Monroe was ordered out of bed and taken into the front room. Monroe was either totally naked or clothed only with a T-Shirt. Mrs. Monroe was allowed to pull a blanket about herself as she was gotten out of the bed by one of the officers.

Several of the officers who had been stationed outside gained entry through the front door. The closets, furniture and mattresses were searched for white dress shirts and weapons, but none were found. During this flurry of activity, all members of the family were aroused.

The children began crying and hollering, and some began yelling abusive language at the officers in an effort to attract the officers' attention. One of the older boys, who was especially vocal in his denunciations of the officers, received a sharp blow to the head. He fell back against his brother, and the two of them falling crushed their bed to the floor. One of the smaller boys tripped over one of the officers as he attempted to run to his father's side. Mrs. Monroe's daughter attempted to leave the apartment for the purpose of "calling the police", but she was restrained. Pistols were drawn. Heated comments were flung about. Threats of killing were uttered.

Monroe, handcuffed, was handed a pair of his trousers and some other clothing, which he put on, and then he was taken to Central Police Headquarters. Upon his arrival there, he was placed in the lock-up.

Some time before 10:00 A.M. on October 29, 1958, Monroe was placed in a line-up. Mrs. Saisi was unable to identify him. Shortly thereafter, defendant Howard M. Pierson, a Deputy Chief of Detectives, and on that day, the Acting Chief of Detectives, upon being informed that Monroe had been "cleared", made the following notation on Monroe's arrest slip: "Okay to release at 10:00 a. m., Acting Chief of Detectives Howard M. Pierson". Before Monroe was released, however, Pierson was informed by defendants Edward Bray and John Bosquette, both of whom were officers assigned to the Robbery Detail, that the Robbery Section wanted Monroe for investigation. Pierson responded, "All right, hold the release up until the Robbery Section are through with their investigation and the Commander of the Robbery Unit or the other Deputy Chief of Detectives [referring either to Frank Pape, or more probably to one James P. Hurley, who was the Acting Chief of Detectives on the 4:00 P.M. to 12:00 Midnight shift] can either book or release him—whatever should be done."

Thus, Monroe remained in the lockup while Bray and Bosquette arranged for robbery victims to appear at an afternoon line-up. There had been a serious plague of robberies of cab drivers. None of the witnesses, however, was able to identify Monroe. Eventually, when Deputy Commander James P. Hurley reported for work and found a James Monroe still locked up without a charge against him, Monroe, at 4:30 P.M., was released and driven to his home by Officer Bosquette.

Shortly after this episode had transpired, Mrs. Saisi confessed to her personal involvement in a premeditated murder of her husband.

These were the facts presented to the jury.

James Monroe, his wife, Flossie, and each of their several children, instituted this civil rights action, pursuant to 28 U.S.C.A. §§ 1331 and 1343, 42 U.S.C.A. § 1983, and the Fourteenth Amendment to the Constitution of the United States, against all of the police officers involved in this incident. In the course of the trial of the case, certain of the officers were dismissed as parties defendant and the case went to the jury as to the defendants Frank Pape, Edward Cagney, Howard Pierson, John Bosquette and Edward Bray.

After approximately thirteen hours of deliberation, the jurors returned their verdicts. While they found in favor of James and Flossie Monroe in the sum of $13,000, they held against each of the children.

The defendants thereupon filed a post-trial motion for judgment notwithstanding the verdicts or in the alternative, for a new trial. The primary ground upon which this motion is based is that the instructions read to the jury were prejudicial. It is the defendants' contention that this Court was bound to instruct the jury simply by reading to them the pertinent statutes and case decisions without any degree of interpolation and explanation, but that the Court engaged in extended interpretation of the law. The disputed instructions follow:

"This action is brought by the plaintiffs and each of them under the

provisions of Title 42, Section 1983 of the United States Code, which is a federal statute and which provides in relevant part as follows: 'Every person who, under color of [law] subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law * * *.'

"The phrase 'under color of law' means in this case by virtue of authority vested by the Laws of the State of Illinois.[1]

"Defendants in this case have admitted that in all of the acts complained of herein they, and each of them, acted under color of law within the meaning of this statute.

"You are further instructed that the plaintiffs in this case, and each of them, are persons within the jurisdiction of the United States. Insofar as they are material to this case, the rights, privileges and immunities secured by the Constitution and Laws of the United States referred to in the statute above are those rights, privileges and immunities made available to all citizens and persons through the provisions of the Fourth Amendment and the Fourteenth Amendment to the Constitution of the United States.[2]

"The Fourth Amendment to the Constitution of the United States provides in words and figures as follows: 'The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.'

"The Fourteenth Amendment to the Constitution of the United States provides, insofar as it is material herein, as follows: 'No state shall * * * deprive any person of life, liberty, or property, without due process of law.'

"For the purposes of this case, any acts of the defendants herein in that they admit having acted under color of law are the acts of the State of Illinois within the meaning of the Fourteenth Amendment.[3]

"The elements of the offenses charged by each of the plaintiffs are: (1) That he or she is a person within the jurisdiction of the United States; (2) that the defendants charged acted under color of law; and (3) that, in the course of such action, such defendants deprived such plaintiffs of rights, privileges and immunities as set out in the Fourth and Fourteenth Amendments to the Constitution of the United States above.

"If you shall find, from all of the evidence and upon a greater weight of the evidence, as to any plaintiff that he or she has established each of such elements of the offense as charged as against any defendant or defendants, then you shall find in such case for such plaintiff and against such defendant. But if you find from your consideration of all the evidence that such plaintiff has failed to establish by the greater weight of the evidence any one of such elements of the offenses so charged as against a defendant so charged, then you shall find against

---

1. Monroe v. Pape, 365 U.S. 167, 168–187, 81 S.Ct. 473, 5 L.Ed.2d 492. See also: Williams v. United States, 341 U.S. 97, 98–100, 71 S.Ct. 576, 95 L.Ed. 774; Screws v. United States, 325 U.S. 91, 107–113, 65 S.Ct. 1031, 89 L.Ed. 1495; United States v. Classic, 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368.

2. Elkins v. United States, 364 U.S. 206, 213, 80 S.Ct. 1437, 4 L.Ed.2d 1669. See also: Wolf v. Colorado, 338 U.S. 25, 27–28, 69 S.Ct. 1359, 93 L.Ed. 1782, as modified by Mapp v. Ohio, 367 U.S. 643, 650–660, 81 S.Ct. 1684, 6 L.Ed.2d 1081.

3. See Note 1, supra.

such plaintiff and in favor of such defendant.

"The plaintiffs' theory of this case is that the plaintiff, James Monroe, sustained damages as a result of the deprivation of rights, privileges and immunities secured to him by the Constitution and Laws of the United States as a result of the conduct of the defendants, Edward Cagney, Frank Pape, Howard Pierson, John Bosquette, and Edward Bray, in that, on or about October 28, 1958, the defendant Edward Cagney ordered his arrest, without a warrant and without probable cause, and that pursuant thereto he was unlawfully arrested and detained, and, in the course of such unlawful arrest and detention, he was subjected to personal abuse; that at or about the hour of 5:45 A.M., on October 29, 1958, the defendant Frank Pape, with a number of other officers under his command and direction, unlawfully entered the apartment of the plaintiff and unlawfully arrested and unlawfully caused the arrest of the plaintiff, and in the course of said arrest submitted the plaintiff to abuse, and further unlawfully searched and caused the search of the home of such plaintiff and, as a result thereof, caused the unlawful detention of the plaintiff, in the course of which he was subjected to abuse. And, further, that the defendants Howard Pierson, John Bosquette, and Edward Bray, without a warrant and without probable cause, on or about the hour of 10:00 A.M., on October 29, 1958, caused the unlawful arrest and detention and false imprisonment of the plaintiff until 4:30 P.M. of that day, in the course of which detention they denied him the right to appear before the nearest magistrate or judge in the County without unnecessary delay, and further subjected him to abuse.

"It is the general theory of the case of the plaintiff James Monroe that as to each of the defendants above their conduct to him was unlawful and unreasonable and otherwise violative of his constitutional rights. It is the theory of all of the plaintiffs, including James Monroe, that on or about October 29, 1958, at the hour of 5:45 A.M. more or less, the defendant Frank Pape unlawfully entered their home, unlawfully subjected their home to an unreasonable search and seizure and, in the course thereof, unlawfully detained them and subjected them to abuse, in violation of rights granted to them by the Constitution and Laws of the United States.

"The theory of the defendants in the case is that the order of arrest without a warrant issued by the defendant Edward Cagney was issued upon probable cause and was lawful; that entry into the apartment of the defendants for the purpose of performing an arrest of the plaintiff James Monroe by the defendant Frank Pape and other officers under his command was performed according to law; that it was unnecessary that he have an arrest warrant or a search warrant; that neither the arrest of James Monroe nor the search of the home was performed illegally or in an unreasonable manner; that the detention of James Monroe which followed was in accordance with law and was reasonable; that his further detention, from 10:00 A.M. to 4:30 P.M., on October 29, 1958, did not constitute a new arrest and detention, but was a lawful detention; and that in the course thereof he was not abused and that all of the acts of the defendants were lawful; that the plaintiffs were at no time abused; that none of the acts of the defendants were unreasonable; and that no rights guaranteed to the plaintiffs by the Constitution and Laws of the United States in any manner were denied to any of the plaintiffs.

\*　　\*　　\*　　\*　　\*　　\*

"And now I shall give you certain special instructions with relation to the law of arrest and search and seizure, to be applied to this case. This is an area of law requiring of lawyers years of study to fully understand, but there are certain basic principles which, if carefully presented and attentively received, can serve all of us adequately in our acquiring the law to be applied to the facts of this case.

▄▄▄▄ "In the course of these special instructions many terms will be used which are peculiar to the field of law enforcement and with which all of us are acquainted. For example, we all know that an 'arrest' signifies the restraint of a person by or on behalf of state or governmental authority, serving as the commencement of a detention or imprisonment of that person within the physical custody of that authority.[4] We all know that a 'search' implies the authoritative invasion and quest and generally an examination of or into the person, the property, the premises or the personal effects of a person for the purpose of locating a person or thing or fact material to an issue at law.[5] And we know that a 'seizure' implies the taking possession by lawful authority of a person, thing or fact located in the process of the performance of a search.[6]

"Two terms which are used again and again in this area of the law are somewhat technical in their implications, and require of us special consideration. They are the terms 'probable cause' and 'reasonableness'.

▄▄▄▄ "For example, it is said that an arrest may be made without a warrant when a crime has in fact been committed and the arresting officer has probable cause for making the arrest. The statutes of Illinois replace the term 'probable cause for making the arrest' with the term 'has reasonable ground for believing that the person [arrested committed the crime] '.[7] Whichever of the terms is used, the idea to be conveyed is that the information justifies more than a suspicion, though it need not contain evidence sufficient to bring about a conviction.[8] Therefore, probable cause for

4. Hogan v. Stophlet, 179 Ill. 150, 154, 53 N.E. 604, 606, 44 L.R.A. 809 ("arrest" means "the apprehension or detaining of the person in order to be forthcoming to answer to an alleged or suspected crime") ; People v. Mirbelle, 276 Ill.App. 533, 540–542 (excellent discussion of the meaning of the word "arrest"). See also: United States v. Scott, D.C., 149 F.Supp. 837, 840 ("the term arrest may be applied to any case where a person is taken into custody or restrained of his full liberty, or where the detention of a person in custody is continued even for a short period of time"; "a restriction of the right of locomotion or a restraint of the person").

5. Weeks v. United States, 232 U.S. 383, 397, 34 S.Ct. 341, 346, 58 L.Ed. 652 ("search" means a "quest by an officer of the law") ; Hale v. Henkel, 201 U.S. 43, 76, 26 S.Ct. 370, 50 L.Ed. 652 (same) ; Haerr v. United States, 5 Cir., 240 F.2d 533, 535 ("[a] search implies an examination of one's premises or person with a view to the discovery of contraband or evidence of guilt to be used in prosecution of a criminal action"; "[t]he term implies exploratory investigation or quest") ; McDonald v. United States, 83 App.D.C. 96, 166 F.2d 957, 958 ("'search' connotes uncovering that which is hidden") ; People v. Cattaneo, 6 Ill.2d 122, 125, 126 N.E.2d 692 ("[a] 'search' implies a prying into hidden places") ; People v. Exum, 382 Ill. 204, 210, 47 N.E.2d 56, 59 (same) ; People v. Marvin, 358 Ill. 426, 428, 193 N.E. 202, 203 (same; "[a] search implies an invasion and quest with some sort of force, either actual or constructive").

6. Weeks v. United States, supra ("seizure contemplates a forcible dispossession of the owner") ; Hale v. Henkel, supra (same) ; Lee v. United States, 95 U.S. App.D.C. 156, 221 F.2d 29, 30 (no seizure in legal sense where forceful dispossession not involved).

7. 38 S.H.Ill.Ann.Stats. § 657.

8. Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (probable cause "is a reasonable ground for belief of guilt" which means "less

an arrest without a warrant, is reasonable ground of probability supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused guilty.[9] 'Probable cause' or 'reason to believe', therefore, is like a third quarter percentile: it is more information than would justify the officer in saying, 'From all the circumstances I suspect this is the man'; but it need not be such information as would justify the officer in saying, 'From all the circumstances I know this is the man'.

"And then there is the term 'reasonableness'. We speak of what a 'reasonable man' would do under the circumstances. We speak of 'reasonable ground', of 'reason to believe', or 'reasonable search', or 'reasonable conduct'. What is reasonable is just what the term implies: Under all the facts, and considering all the circumstances, what thought or conduct would be founded upon reason.[10] To apply this concept you must place yourself in the position of the person about whom you are talking, and in that position you must think and act as a 'reasonable man.'[11] From this perspective you ask yourself what thought or conduct would be founded upon reason. For 'reason' is rationalized understanding and the exercise of the reasoning faculty by the mind rightly exercising right thinking.[12]

"The rule of 'reason' permeates this whole field of law, and in any given situation, the answer as to what was lawful and what was unlawful will be found, in the light of all of the facts of the whole of the incident, by determining what was reasonable.

"This long prevailing standard seeks to safeguard citizens from rash and unreasonable interference

---

than evidence which would justify condemnation" or conviction but "more than bare suspicion"); Bucher v. Krause, 7 Cir., 200 F.2d 576, 582 ("mere suspicion" is "a wholly inadequate basis for action under Illinois Law"); United States v. Johnson, 113 F.Supp. 359, 360 ("[p]robable cause means more than suspicion"); People v. Jones, 16 Ill.2d 569, 573, 158 N.E.2d 773, 776 (" '[r]easonable cause' or 'reasonable grounds' * * * means something less than evidence which would result in conviction"); People v. Galloway, 7 Ill.2d 527, 535, 131 N.E.2d 474 (a suspicion must be founded upon facts supporting a reasonable belief that the prisoner is guilty of a crime); People v. Barg, 384 Ill. 172, 177, 51 N.E.2d 168, 171 ("arrests upon bare suspicion are not permitted under the law"); People v. Exum, 382 Ill. 204, 211, 47 N.E.2d 56 (same); People v. Henneman, 373 Ill. 603, 606, 27 N.E.2d 448 (same); People v. Brewer, 355 Ill. 348, 357, 189 N.E. 321 (same).

9. Henry v. United States, 361 U.S. 98, 101–102, 80 S.Ct. 168, 170–171, 4 L.Ed.2d 134 ("[p]robable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed"); Draper v. United States, 358 U.S. 307, 310–313, 79 S.Ct. 329, 331–333, 3 L.Ed.2d 327

("[p]robable cause exists where 'the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed"); Brinegar v. United States, supra, 338 U.S. at 175–176, 69 S. Ct. at 1310–1311, 93 L.Ed. 1879 (same); People v. Jones, supra, 16 Ill.2d at 574, 158 N.E.2d at 776 (same); People v. La Bostrie, 14 Ill.2d 617, 622, 153 N.E.2d 570 (similar); People v. Barg, supra (similar).

10. United States v. Rabinowitz, 339 U.S. 56, 59–64, 70 S.Ct. 430, 432–435, 94 L. Ed. 653 ("[t]he recurring questions of the reasonableness of searches must find resolution in the facts and circumstances of each case"); Go-Bart Importing Co. v. United States, 282 U.S. 344, 357, 51 S.Ct. 153, 75 L.Ed. 374 (similar); People v. La Bostrie, supra, 14 Ill.2d at 621–622, 153 N.E.2d at 572–573 (similar).

11. Henry v. United States, supra, 361 U.S. at 102, 80 S.Ct. at 171, 4 L.Ed.2d 134; People v. Watkins, 19 Ill.2d 11, 18, 166 N.E.2d 433; People v. La Bostrie, supra, 14 Ill.2d at 622, 153 N.E.2d at 573.

12. State v. Smith, 22 N.J. 59, 123 A.2d 369.

with privacy and from unfounded charges of crime; while at the same time it seeks to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of the execution of their duties are more or less ambiguous, room must be allowed for uncertainties on their part. The burden upon them should never be greater than that they act upon those uncertainties reasonably as reasonable men. Requiring more of them would unduly hamper law enforcement. To allow less would be to leave the citizen at the mercy of the officer's whim or caprice.

"And now, with your understanding this 'Rule of Probable Cause' and this 'Rule of Reasonableness', let me proceed on into these special instructions on the law of arrest and search and seizure.

"The principal guarantee provided citizens against tyranny of a police state in the administration of criminal law lies in the authority of the judicial branch of our government to exercise checks upon the actions of the executive branch. Thus, with relation to 'arrest', the question of probable cause, or reason to believe that the person to be arrested committed the crime, must always be checked by a judicial officer.[13] If the arrest is to be made with a warrant, the arresting officer presents the information upon which he relies as establishing probable cause to a judicial officer, a judge or justice of the peace, who passes upon the sufficiency of the information. If the judicial officer considers the information sufficient, he issues his judicial authority to the officer to make the arrest. We call it an arrest warrant.

"On the other hand, if the arrest is to be made without a warrant, at the earliest reasonable time after the arrest, and in the presence of the person arrested, the arresting authority presents the information relied upon as establishing probable cause for the arrest, before the judicial officer or magistrate who passes upon the sufficiency of the information.[14] If he finds it sufficient, he approves the arrest which already had been made. This procedure is called presentment for arraignment. This is not to be confused with what is sometimes known as 'booking', a voluntary procedure of a police department exercised in the interest of all persons arrested, whether with or without a warrant, by which the arresting officer, with the approval of his commanding officer and without unnecessary delay after effecting the arrest, shall make a public record in the police department of the person arrested and the charge upon which he was arrested. The arraignment is the presentment of the arrested person before a judicial officer required by the law of the state.

"Therefore, the law of the State of Illinois, in such words and figures as are material here provides: 'When a complaint is made under oath before a judge or justice of the peace that a criminal offense has been committed, and upon examination of the complaint the judge or justice of peace finds that there is reasonable grounds to believe that a certain person has committed the crime, he shall issue a warrant for the arrest of such person.'[15]

"And the law of the State of Illinois, in such words and figures as are material here, further provides: 'An arrest may be made by a police officer without a warrant, when a

13. 38 S.H.Ill.Ann.Stats. § 662 et seq.; Giordenello v. United States, 357 U.S. 480, 485-486, 78 S.Ct. 1245, 2 L.Ed.2d 1503.

14. 38 S.H.Ill.Ann.Stats. § 660.

15. 38 S.H.Ill.Ann.Stats. § 663.

criminal offense has in fact been committed, and he has reasonable ground for believing that the person to be arrested committed it.'[16]

"And the law of the State of Illinois, in such words and figures as are material here, further provides:

'And when an arrest is made without a warrant, the person arrested shall, without unnecessary delay, be taken before the nearest magistrate, who will hear the case, and the person shall be examined, and shall otherwise be dealt with as in cases of arrests upon warrant.' [17]

■■ "It is to be noted that this latter provision calls for arraignment 'without unnecessary delay'. It is the law that necessary delay is such delay as is necessary to the facilities reasonably available for transmitting the arrested person to the committing magistrate, as well as the availability of the committing magistrate in the usual course of his business. Delay that is necessary is not that which would relate to further investigation to establish the probable cause which should have existed before the arrest. However, since the command, without unnecessary delay, must be considered as not calling for mechanical or automatic obedience, what constitutes 'necessary delay' must be determined from all the circumstances attendant upon the arrest and the detention prior to the arraignment.[18] During a reasonable detention prior to arraignment caused by 'necessary delay', as hereinabove it has been described, it is not unlawful for the arresting officer or the detaining officer to utilize the availability of the person arrested to further investigate the crime for which he was arrested, in an effort to obtain additional facts which may be needed in the trial of the case against him, since the legality of the arrest without a warrant will be determined by the judicial officer on the basis of the facts available to the arresting officer prior to the arrest, and not those acquired afterwards.[19] The arrested person has the protection that if his arrest without a warrant was unlawful in the first instance because of the insufficiency of probable cause at the time of arrest, he will be discharged and evidence about the same crime obtained from him after or as an incident of his arrest cannot later be used against him.[20]

16. 38 S.H.Ill.Ann.Stats. § 657.

17. 38 S.H.Ill.Ann.Stats. § 660.

18. See: 1 Chitty, Cr.Law, 59, 60; 2 Hale, 95, 96, 119, 120, Cf.; Mallory v. United States, 354 U.S. 449, 451–456, 77 S.Ct. 1356, 1 L.Ed.2d 1479; United States ex rel. Weber v. Ragen, 7 Cir., 176 F.2d 579, 583–584; Mooradian v. Davis, 302 Mich. 484, 5 N.W.2d 435; Peloquin v. Hibner, 231 Wis. 77, 285 N.W. 380.

19. Cf., United States v. Carignan, 342 U.S. 36, 39, 72 S.Ct. 97, 99, 96 L.Ed. 48 ("[s]o long as no coercive methods by threats or inducements to confess are employed, constitutional requirements do not forbid police examination in private of those in lawful custody or the use as evidence of information voluntarily given").

20. Rios v. United States, 364 U.S. 253, 261–262, 80 S.Ct. 1431, 1436, 4 L.Ed.2d 1688 (where an arrest is unlawful "then nothing that happened thereafter could make that arrest lawful, or justify a search as its incident"); Upshaw v. United States, 335 U.S. 410, 411–414, 69 S.Ct. 170, 93 L.Ed. 100 (similar) (Cf., McNabb v. United States, 318 U.S. 332, 341–345, 63 S.Ct. 608, 87 L.Ed. 819 (even though arrest may in fact have been lawful, under strict federal rule, evidence obtained thereafter through interrogation may not be used against prisoner where he was not carried forthwith before a committing magistrate)); People v. Edge, 406 Ill. 490, 496, 94 N.E.2d 359 (an arrest for questioning upon bare suspicion is without sanction of law); People v. Henneman, 367 Ill. 151, 153–154, 10 N.E.2d 649 (the arrest must be legal or the search is illegal); People v. Ford, 356 Ill. 572, 576, 191 N.E. 315 (discovery of evidence after arrest cannot relate back to, and operate as a justification for arrest); People v. Scalisi, 324 Ill. 131, 150, 154 N.E. 715 (when police seek to

■ "It is not unlawful for a person to be released, after an arrest without a warrant, without his having been taken before a committing magistrate for arraignment, nor does that fact standing alone render his arrest unlawful. That fact, however, is a circumstance to be considered with all other evidence in a determination of whether in the first instance there was probable cause for his arrest.

■ "A person lawfully arrested without a warrant cannot complain about his detention before arraignment, if it is not caused by unnecessary delay, and if his detention in all its aspects is reasonable, considering all the circumstances.[21]

■ "An arrest may be made anywhere and at any time.[22] If the arrest be lawful, that is, by warrant, or if without warrant, on probable cause, the fact that it is made in a private place rather than in a public place does not make it any less lawful. Because of the fundamental concept in our law of the ancient adage that 'A man's home is his castle', entry into a house or apartment or other place of abode commonly known as a home, for the purpose of making an arrest inside, may be made only after the arresting officer has given notice to a responsible person therein of his authority and his purpose.[23] Failure to give notice to a responsible person of the authority of the arresting officer and his purpose, before entry, will render an ensuing arrest within unlawful.[24] But if proper notice is given, the arresting officer may then enter; and if he is denied admittance he may break open any outer door or inner door or window of the house or any part of the house, using only such force as is necessary, to gain entrance to perform that arrest.[25] And in determining the legality of an entry for the purpose of performing an arrest, the questions of the adequacy of the notice, the responsibleness of the person to whom notice is given, and the necessity of breaking to enter, if there was such a breaking, are questions of fact to be decided under all of the circumstances, and from all the evidence.[26]

■ "There are emergency exceptions to these rules, however.[27] The first emergency exception is that in the hot pursuit of a person to be arrested, the arresting officer may proceed behind him into the home without giving notice. The second emergency exception is that if it is necessary, under all the circumstances, that entry without notice be made in order to protect the life of the arresting officer, notice need not be given. A third emergency exception is that if the very fact of giving notice will permit the escape of the person to be arrested, notice need not be given. Under any of these exceptions to notice, what is reasonable must be determined from all the circumstances, including those circumstances relating to the availability of other times and places for making the arrest, the information supporting reason to believe that notice will result in the escape of the person to be arrested, and such considerations as the presence of other and innocent persons on the inside and the probability and degree of injury or harm to them which would reasonably rest

arrest a person without probable cause for questioning, said arrest is unlawful).

21. See note 18.

22. 38 S.H.Ill.Ann.Stats. § 659.

23. 38 S.H.Ill.Ann.Stats. § 695; Cf., Weeks v. United States, 232 U.S. 383, 390–391, 34 S.Ct. 341, 58 L.Ed. 652.

24. Cf., Accarino v. United States, 85 U.S. App.D.C. 394, 179 F.2d 456, 456–465 (excellent discussion of the law as it relates to notice and right of entry).

25. 38 S.H.Ill.Ann.Stats. § 695.

26. Cf., Accarino v. United States, supra.

27. Cf., Accarino v. United States, supra.

upon the nature of the entry. The rule to apply in any such instance is the rule of reason, as hereinbefore described to you.

"The law relating to search and seizure is more restricted than the law relating to arrest.[28] This is because the Constitution of the United States and the Constitution of the State of Illinois expressly provide limitations upon invasions of the privacy of the individual and his home and personal effects.

"The Constitution of the United States, in such words and figures as are here material, provides: 'The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.'

"And the Constitution of the State of Illinois, in such words and figures as are here material, provides: 'The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures shall not be violated; and no warrant shall issue without probable cause, supported by affidavit, particularly describing the place to be searched, and the persons or things to be seized.'

"It is first to be noted that both constitutional provisions contemplate the issuance of search warrants for the purpose of searching for people as well as for things. Accordingly, an entry which otherwise would be for the purpose of performing an arrest, under circumstances where there is no probable cause or reason to believe that the person to be arrested is in fact on the inside, would constitute an entry for the purpose of performing a search for such person, and would thus have to be governed by the law relating to searches and seizures.

"The laws of the State of Illinois provide for the issuance of a search warrant by a judge or justice of the peace for searches in the daytime, and by two judges or justices of the peace for searches in the nighttime, to locate certain specified things, including among them firearms possessed by persons not authorized by law to carry them.[29] As in the case of an arrest warrant, the question of probable cause, or reason to believe, is determined by the judicial officer before such search is made.[30]

"Also, as in the case of an arrest, an officer may enter a home to execute a search pursuant to a search warrant, after giving notice to a responsible person of his authority and purpose; and if he be refused entry, using no more force than is necessary, he may break open any outer or inner door or window of a house or anything therein, in order to execute the search pursuant to such warrant.[31]

"Although there may be an arrest without a warrant, upon probable cause, under the laws of Illinois, though the law may be different in other states, there may not be a search of a home without a warrant.[32] In Illinois there are two ex-

28. Lee v. United States, 98 U.S.App.D.C. 97, 232 F.2d 354, 354–357; United States v. Scott, D.C., 149 F.Supp. 337, 840–842.

29. 38 S.H.Ill.Ann.Stats. §§ 691–694.

30. Johnson v. United States, 333 U.S. 10, 13–14, 68 S.Ct. 367, 92 L.Ed. 436; 38 S.H.Ill.Ann.Stats. § 691 et seq.; People v. Elias, 316 Ill. 376, 381, 147 N.E. 472;

People v. Prall, 314 Ill. 518, 522, 145 N. E. 610.

31. See notes 23 and 24, supra.

32. See note 28; People v. Grod, 385 Ill. 584, 592, 53 N.E.2d 591 (under both the United States and Illinois Constitutions, the home of a person generally may not be searched without a warrant).

ceptions to this rule. The first exception is that the person whose place is to be searched, himself or herself, may consent to a search of the place, and a search performed pursuant to such consent will be a lawful search, even though without a warrant.[33] The second exception is that after the performing of a lawful arrest, the person arrested, his reasonably proximate surroundings and rooms in which he is or resides, may be searched, as an incident of his arrest, to find weapons that would be dangerous to the arresting officer, and to find evidence establishing and fruits resulting from the crime of which he was arrested.[34] Whether such a search following an arrest is lawful will be determined on the lawfulness of the arrest in the first instance, and upon the reasonableness of the search in the last instance.[35]

"The law does not specify what is or is not reasonable conduct in the performance of a search. The constitutional admonition is a general one prohibiting 'unreasonableness' in searches.

"What constitutes a reasonable search, then, must be determined upon the application of the rule of reasonableness to all the circumstances, from the perspective of a reasonable person in the same position of the searching officer at the time and under the conditions attending the search.[36]

"From what I have now said, you may observe that the rule of 'reason' permeates the whole field of arrest and search and seizure, and the answer as to what was lawful and what was unlawful in any given matter will be found by you from all the facts before you as to what, if anything, was reasonable, and what, if anything, was unreasonable."

I find the criticisms of the defendants with regard to these instructions untenable. The instructions consist of a synthesization and interpretation of all the Federal and State statutes and case decisions that are applicable to this case. And under the circumstances of this case and the rather complex law applicable thereto, I think it was quite proper to take the instructions as requested by the respective parties, add thereto the Court's own instructions, and therefrom formulate a general charge embracing all the matters of law arising on the pleadings and the evidence.[37] I believe this was the best way to intelligently and adequately instruct the jurors in an area of the law which otherwise would more than likely be misconstrued by them or remain in their minds

33. Zap v. United States, 328 U.S. 624, 628, 66 S.Ct. 1277, 90 L.Ed. 1477; People v. Preston, 341 Ill. 407, 416, 173 N.E. 383, 77 A.L.R. 631; People v. Akers, 327 Ill. 137, 138, 158 N.E. 410.

34. United States v. Rabinowitz, 339 U.S. 56, 57–66, 70 S.Ct. 430, 94 L.Ed. 653; Harris v. United States, 331 U.S. 145, 150–155, 67 S.Ct. 1098, 91 L.Ed. 1399; People v. Watkins, 19 Ill.2d 11, 17–20, 166 N.E.2d 433; People v. West, 15 Ill. 2d 171, 174–177, 154 N.E.2d 286; People v. La Bostrie, 14 Ill.2d 617, 621, 153 N.E.2d 570; People v. Heidman, 11 Ill.2d 501, 508, 144 N.E.2d 580; People v. Tillman, 1 Ill.2d 525, 529, 116 N.E.2d 344.

35. United States v. Rabinowitz, supra; People v. Watkins, supra.

36. United States v. Rabinowitz, supra; People v. Watkins, supra.

37. See: Northern Pacific Railway Company v. Haugan, 8 Cir., 184 F.2d 472, 477 (court need not use exact language of requested instructions); Southern Pacific Company v. Guthrie, 9 Cir., 180 F.2d 295, 301 (it belongs to the judicial office to exercise discretion as to the style and form in which to expound the law); Gray v. Dieckmann, 1 Cir., 109 F.2d 382, 388 (a judge in instructing a jury cannot be held up to the exactitude of legal expression but must apply his instructions with a broad brush); Radius v. Travelers Insurance Company, 9 Cir., 87 F.2d 412, 414 (all that is required is that the jury be fully and fairly instructed on the law of the questions before it for determination).

as a concoction of unintelligible legal language. Accordingly, defendants' motion for judgment notwithstanding the verdicts, or for a new trial, should be, and the same hereby are, denied.

The final matter before me is the request of the Illinois Public Aid Commission for leave to intervene. The motion is brought pursuant to Article VIII, Section 8–19, of the Illinois Charities and Public Welfare Act (Ch. 23, Sec. 819, Ill.Rev.Stats.), which provides in pertinent part as follows:

> "The Commission shall have a charge upon all claims, demands and causes of action for injuries to an applicant for or recipient of assistance for the total amount of assistance provided for the recipient and his dependents from the time of injury to the date of recovery upon such claim, demand or cause of action. 'Recipient', as used herein, means the grantee of record and any person whose assistance needs are included in the assistance awarded to the grantee of record. * * The charge shall attach to any verdict, judgment or decree entered and to any money or property which may be recovered on account of such claim, demand, cause of action or suit from and after the time of the service of the notice. * * * "

It is alleged that the plaintiff, Flossie Monroe, had received Aid to Dependent Children since October 29, 1958, and that at the time of the filing of this motion the amount received, up to and including August 31, 1962, (after which time plaintiff voluntarily withdrew from receiving such support) was $8,451.00.

Rule 24 of the Federal Rules of Civil Procedure provides for both permissive intervention and intervention as of right. In each instance timely application must be made. However, whether as of right or by permission of the Court, Rule 24

is silent as to what constitutes timely application.

Even though the petition was filed after the verdicts had been entered, under the circumstances of this case, and due to the nature of the requested intervention, the petition is timely within the meaning of that term as used in Rule 24.[38] No harm, prejudice, or burden will result to any of the parties because the petition is filed on January 11, 1963, rather than on an earlier date. Indeed, the merits of the petition would not have been considered until the verdicts had been rendered anyway, for if the verdicts had been favorable to the defendants, there would have been no need to consider the petitioner's claim.

But there are other requirements under Rule 24 which must be complied with before one may be permitted to intervene. Under sub-part (a) one may intervene as a matter of right: (1) When a statute of the United States confers an unconditional right to intervene; or (2) when the representation of the applicant's interest by existing parties is or may be inadequate and the applicant is or may be bound by a judgment in the action; or (3) when the applicant is so situated as to be adversely affected by a distribution or other disposition of property which is in the custody or subject to the control or disposition of the court or an officer thereof.

The Illinois Public Aid Commission may not intervene as a matter of right for three reasons. (1) There is no statute of the United States which confers such right upon the petitioner, and the State of Illinois is powerless to create a right to be heard in a Federal Court where that right does not exist under the laws of the United States, especially where the State's claim arises under its own law, where the State is neither an indispensable nor a necessary party, and where there is no diversity of citizenship to support the jurisdictional requirements of the Court.[39] (2) The

---

38. Cf., Wolpe v. Poretsky, 79 U.S.App.D. C. 141, 144 F.2d 505, 508 (intervention allowed after final decree).

39. Cf., Chicago, Rock Island & Pacific Railroad Company v. Studey, 346 U.S. 574, 580, 74 S.Ct. 290, 98 L.Ed. 317

petitioner will in no way be bound by the judgment in this action. (3) The petitioner will not be adversely affected by the disposition of this case, and even if it were, this Court does not have the required "custody" of property, nor any property as a result of the judgment in this case which is subject to its control or disposition. It would indeed require a strained construction of Rule 24(a) for petitioner to fall within its provisions.

Nor may petitioner intervene by permission under sub-part (b) of Rule 24. There is no statute of the United States which confers such right on petitioner, nor does petitioner's claim have a question of law or fact in common with the main action. Furthermore, the intervention, if allowed, would most certainly prejudice the adjudication of the rights of the plaintiffs. The motion to intervene would be denied on the basis of this rule alone.

Even were we to assume that the petitioner might intervene under the rule, the petition nevertheless would have to be dismissed on its merits. The Illinois statute not only denies due process and equal protection of the laws, as applied to the facts of this case, but more, it stands in derogation of the full enforceability of the Federal law and thus would conflict with the supremacy clause of the United States Constitution. Art. VI, Cl. 2.[40]

Accordingly, petitioner's motion to intervene is denied.

(state's procedural provisions cannot control the privilege of removal granted by the federal statute); Holmberg v. Armbrecht, 327 U.S. 392, 395, 66 S.Ct. 582, 90 L.Ed. 743 (federal courts apply their own principles in enforcing federal rights); Penn General Casualty Company v. Com. of Pennsylvania ex rel. Schnader, 294 U.S. 189, 197, 55 S.Ct. 386, 79 L.Ed. 850 (the jurisdiction conferred on the district courts by the Constitution and laws of the United States cannot be affected by state legislation); The Pusey & Jones Company v. Hanssen, 261 U.S. 491, 497–498, 43 S.Ct. 454, 67 L.Ed. 763 (a remedial right to proceed in a federal court cannot be enlarged or diminished by a state statute); Lone Star Package Car Company v. Baltimore & Ohio Railroad Company, 5 Cir., 212 F.2d 147, 154 (the jurisdiction of the federal court does not depend upon the statutes of the several states); Humble Oil & Refining Company v. Sun Oil Company, 5 Cir., 190 F.2d 191, 197 (rule 24 does not confer upon a federal court jurisdiction to adjudicate a state's claim or require the court to permit a state to intervene where jurisdiction depends solely upon diversity of citizenship and the presence of the state as a party litigant would defeat the jurisdiction of the court);

Davidson v. Gardner, 7 Cir., 172 F.2d 188, 191 (Congress alone determines and limits the jurisdiction of the courts of which it is the creator); Davis v. Ensign-Bickford Company, 8 Cir., 139 F.2d 624, 626 (the jurisdiction of federal courts is not and never has been controlled by state law).

40. Free v. Bland, 369 U.S. 663, 666, 82 S.Ct. 1089, 8 L.Ed.2d 180 (any state law, however clearly within a state's acknowledged power, which interferes with federal law, must yield); McKnett v. St. Louis & San Francisco Railway Company, 292 U.S. 230, 234, 54 S.Ct. 690, 78 L.Ed. 1227 (a state may not discriminate against rights accruing under federal laws); Caldwell v. Alabama Dry Dock & Shipbuilding Company, 5 Cir., 161 F.2d 83, 85 (same); Buck v. Swanson, D.C., 33 F.Supp. 377, 387 (a state statute, though enacted in pursuance of the police power, is void if in contravention of any express provision of the Federal Constitution or of a valid federal statute, or if it constitutes an interference with matters that are within the exclusive scope of federal power), rev'd on other grounds, Marsh v. Buck, 313 U.S. 406, 61 S.Ct. 969, 85 L.Ed. 1426.